[Civ. No. 25629.   Second Dist., Div. Three.   Apr. 19, 1962.]

JOEL MICHAEL MILNE, Plaintiff and Respondent, v. GERALDINE MILNE GOLDSTEIN, Defendant and Appellant.

Hahn, Ross & Saunders and E. Lloyd Saunders for Defendant and Appellant.

Bernard B. Cohen for Plaintiff and Respondent.

SHINN, P. J.—Plaintiff and defendant are the divorced parents of two young girls who reside with their mother in Burbank. Plaintiff, who is a resident of the City of Johannes-

burg, Union of South Africa, instituted the present action seeking a judgment that the daughters visit him in Johannesburg for six weeks of each summer school vacation. Defendant answered and filed a cross-complaint by which she sought judgment that the daughters should remain with her and that plaintiff be enjoined from removing them from the County of Los Angeles. Pursuant to the requests of the parties, the judgment affirmed and declared valid a decree of divorce granted to defendant by the courts of Nevada September 9, 1954, by which decree defendant was awarded custody of the daughters.

The present judgment grants plaintiff the right to have the children visit with him for six weeks during each summer vacation, orders defendant to make necessary arrangements for the children to travel by plane to New York when plaintiff has completed arrangements for their transportation from Burbank to Johannesburg and orders plaintiff to have them returned to the home in Burbank at the end of the visiting periods. It also orders plaintiff to pay certain sums for the support of the children and certain legal expenses. Defendant appeals only from those provisions of the judgment which require that the children visit with plaintiff in Johannesburg.

Plaintiff is 38 years of age and has always been a citizen of Johannesburg. The parties were married in New York July 1, 1947, and soon thereafter took up residence in Johannesburg. The daughters are Linda Cheryl Milne, born July 28, 1948, and Candice Colleen Milne, born October 18, 1950. In 1953, defendant and the children came to California, where they have since resided. In 1954, defendant instituted an action in Los Angeles County seeking support for herself and the children. Plaintiff appeared in the action, which was dismissed. In September 1954, defendant was awarded a divorce and custody of the daughters by a Nevada court. On November 1, 1954, in Johannesburg, plaintiff was awarded a decree of divorce and custody of the daughters. December 8, 1959, defendant married Al Goldstein, and the family consisting of defendant and her husband, her two daughters and a daughter of her husband's by a former marriage, has continued to live in Burbank.

In 1956, 1957, 1958 and 1960, plaintiff visited with the children in Burbank for periods of about six weeks. June 14, 1960, after unsuccessful attempts to reach an agreement with defendant for the children to visit him in Johannesburg, plaintiff instituted the present action.

June 14, 1960, plaintiff obtained an order that defendant show cause why the children should not be allowed to visit him in South Africa for six weeks of every summer vacation. June 22, 1960, defendant obtained an order that plaintiff show cause why he should not be restrained from removing the children from Los Angeles County and from taking them to South Africa. July 7 and 8, 1960, a hearing was had upon the orders to show cause before Court Commissioner Raymond R. Roberts, sitting as judge pro tempore. In a two-day hearing, testimony was given by plaintiff, defendant and defendant's husband. In connection with this hearing plaintiff proposed that he would petition the Supreme Court in Johannesburg for a modification of the decree that had been awarded to him so as to provide that the custody of the children be awarded to defendant and that they be permitted to visit plaintiff in Johannesburg for periods of six weeks during summer vacations. Plaintiff proposed that he would deposit with an escrow holder in Johannesburg 50,000 shares of stock of the Harmony Gold Mining Company, valued at $175,000, the same to be delivered to defendant if the daughters visited with plaintiff in Johannesburg and were not returned at the end of any six weeks period, and to be returned to plaintiff if the daughters did not so visit with him. Plaintiff also prepared the draft of a petition to the Supreme Court in Johannesburg for modification of the decree, as aforesaid, and which provided that he would not make any application to the court to award him custody of the children if he failed in his agreement to return them to California at the end of each visiting period. Plaintiff proposed and later did prepare an agreement under which the children would visit with him each summer; plaintiff would make all arrangements and pay the expenses of their transportation and defendant would do whatever was necessary for their trips to Johannesburg; plaintiff would deposit the 50,000 shares of stock with a trust company as security for the return of the children and would procure the modification of his divorce decree. In February 1961, in a further hearing, Judge Roberts approved the agreement and the form of all other documents.

By order of March 10, entered *nunc pro tunc* as of February 24, Judge Roberts granted the application of plaintiff and required the parties to execute and comply with the terms of the agreement. Plaintiff executed the agreement, but defendant refused to execute it. The judgment in the present action ordered the parties to execute the agreement and to

comply with the same. After the judgment was entered and defendant's motion for new trial had been denied, plaintiff's petition was presented to the Supreme Court of South Africa (Transvaal Provisional Division) and it was granted June 20, 1961. Plaintiff also deposited with a trust company in Johannesburg the 50,000 shares of stock under appropriate escrow instructions. June 7, 1961, plaintiff filed with the American Consul General at Johannesburg a written consent that the daughters leave South Africa at the end of each six weeks' visiting period and he arranged with the American Airlines for the outward and return transportation of the children. Plaintiff fully complied with the terms of the judgment. An application of defendant for stay of execution of the judgment was made to this court and was granted. (*Milne* v. *Goldstein,* 194 Cal.App.2d 552 [15 Cal.Rptr. 243].)

Although plaintiff testified at the hearing of the orders to show cause, he returned to Johannesburg shortly thereafter. He was not present at the trial, in which his testimony previously given was received. The trial lasted through eight days. The record on appeal consists of the clerk's transcript of 296 pages and a reporter's transcript of 807 pages, with numerous exhibits. The briefs on the appeal comprise 297 pages.

The ultimate issue that was tried and determined was whether it was in the best interests and for the welfare of the children that they be permitted to visit with their father for six weeks of each summer vacation. The evidence was directed to the questions whether it would be safe for them to visit in Johannesburg, and whether a doubt existed that plaintiff would cause them to be returned to their home in California. In reply to a criticism that one of the findings of probative facts was unsupported, plaintiff correctly says: "At bar, the *paramount ultimate issue* is whether the interests and welfare of the children will best be served by permitting them to visit their father in South Africa. In the finding above the court found favorably to plaintiff on that paramount issue, which in itself disposes of the case and supports the judgment. It follows that the finding under attack which relates only to probative facts is unnecessary, and defendant's contention that the probative finding is contrary to the evidence is unavailing." Notwithstanding counsel's admitted understanding of the functions of findings, we have in the record 23 findings of evidentiary facts covering 12 pages and 13 conclusions of law covering 6 pages of the clerk's transcript.

The conclusions of law, as well as the judgment, make detailed provision for the transportation of the children to and from Johannesburg and prescribe the duties of the respective parties respecting the same.

The contentions on the appeal are that the judgment constitutes an abuse of discretion for the reason that the evidence established that the daughters would not be returned to California once they were in Johannesburg, and that it would be unsafe for them to visit their father. It is asserted that the trial court committed error in refusing to admit into evidence "current newspaper clippings, newspaper photographs, a radio broadcast teletype for the purpose of taking judicial notice of current history." It is urged that the trial judge prejudged the case and was biased against defendant, that the court committed error in the exclusion of other evidence offered by defendant, and it is further urged that certain of the findings are irreconcilably inconsistent.

In support of the first point, it is argued that if the children went to Johannesburg plaintiff would petition the court to again modify its decree so as to award him the exclusive custody of the children. This is merely an assertion of the fear of defendant and her counsel, for which the record furnishes no justification. Although plaintiff sought and was awarded the custody of the daughters in the action he instituted in 1954, in the present action he acquiesced in the affirmance and establishment of defendant's Nevada decree as a judgment of the California court. His petition to the Supreme Court of South Africa contained a full disclosure of the proceedings in the present action, from which it would appear that he prevailed solely upon the strength of the representations and promises he made to defendant and to the court therein. That he would apply to the court for further modification of the decree assumes that he is without honor, as to which no contention was made and no evidence was offered. And the trial court properly rejected the argument that the Supreme Court of South Africa would aid him in any attempted violation of his promises to defendant and the California court.

There was but a single incident upon which defendant relied in an effort to prove that plaintiff planned at one time to have the children kidnaped. A considerable amount of evidence was received with respect to a letter sent by one Rethorst to plaintiff in 1954, which proposed a scheme for

spiriting the children to Mexico, where they would be delivered to plaintiff. The letter came into the hands of attorneys in Johannesburg, who forwarded it to attorney Harry M. Hunt of Los Angeles, who had done some legal work for plaintiff. Mr. Hunt sent the letter to plaintiff, who brought it to California with him in November 1954, where he discussed it with Mr. Hunt. Plaintiff also sent to defendant a photostatic copy of the letter. Defendant testified that in 1954 she found the letter in plaintiff's luggage when she was packing it for him to leave California, also that she received the letter from Mr. Hunt or Mr. Friedland (plaintiff's South African attorney) and that when she found the letter plaintiff was in South Africa. This incident was fully explained to defendant and her attorney by plaintiff and Mr. Hunt. Plaintiff did not know Rethorst, and had never communicated with him. Rethorst was an irresponsible character who, while represented by Mr. Hunt in domestic difficulties, apparently learned of plaintiff's problems from Mr. Hunt's files. Defendant took the letter to the F.B.I., and there the matter ended.

There was no evidence that plaintiff ever considered taking the children surreptitiously or at all, except as authorized by the court. During all the visits of plaintiff in California defendant willingly granted him the utmost freedom in having the daughters with him, and it was clear that she entertained no fear that he would endeavor to take them from her. The court was fully justified in finding that there was no reason to doubt that the children would be returned to California after their visits with their father.

As previously stated, a most important question was whether the children could visit with their father in safety. Neither in defendant's answer nor in her cross-complaint was it alleged it would be unsafe for the children to spend some time with their father in Johannesburg. Her only pleaded contention was that the children would not be returned. The allegation of the complaint that the interest and welfare of the children would be best served if they were permitted to visit plaintiff was denied in defendant's answer, and it was made an issue by the pretrial order. In a certificate for the order to show cause defendant did not state that it would be unsafe for the children to visit with their father in Johannesburg. During the hearing of the orders to show cause that subject was not an issue. On cross-examination plaintiff was merely asked whether the windows of his apartment were‾

barred and whether he maintained a watchman, both of which questions were answered in the negative.

It appears from the record that defendant's claims that conditions in Johannesburg were such as to render it unsafe for the children to visit there was an afterthought of defendant and that plaintiff's attorney had little opportunity for preparation to resist that claim. Until defendant's attorney inserted in the pretrial statement a few days before the trial commenced that defendant contended it would be unsafe for the children to visit their father, plaintiff's attorney had no reason to suspect that defendant would produce evidence of disorder and violence among the natives of Johannesburg. Plaintiff was at a disadvantage; after the hearing on the order to show cause he had returned home. His attorney made a last minute effort to discover evidence upon the issue. Although the meager evidence that was produced shed little light upon the conditions in Johannesburg with respect to the maintenance of order and the protection of the white residents, we think a brief summary will disclose that the court was warranted in finding that the children could visit their father in safety.

Defendant testified to conditions she had observed before she left Johannesburg in 1953. It was in evidence that of the one million population of Johannesburg, 400,000 are whites or Europeans; the remainder were referred to in the evidence either as Africans or natives. We do not regard it as necessary to state the particulars of the few isolated incidents which Mrs. Goldstein testified she had witnessed, which were relied upon as evidence that white persons could not live in Johannesburg in safety. They related to disturbances among the natives rather than to any conflicts with or molestation of white residents, and her testimony failed to show any laxity or inefficiency of the police. The intensity of defendant's interest in the outcome of the trial, which was manifest throughout, and the inaccuracies and contradictions in her testimony would have warranted the court in refusing to give it full credit.

Defendant produced another witness, Henry Barzilay, who left the Union of South Africa in September 1959, after a residence there of approximately 13 years. He was a news gatherer and broadcaster for radio and broadcasting companies. He described the conditions under which he lived in Johannesburg with his wife. He sent his two daughters, 7

and 4½ years of age, to school accompanied by an adult, and eventually sent them to England because of his fear for their safety. It was customary to have bars on the windows and burglar alarm systems. Native quarters were outside the house proper. Many people employed a guard outside, who would be armed with knob kerry, a stick with a knob on the end of it. Many of his friends carried guns. He described an incident in 1958 in which there was an uprising of African women protesting being required to carry passes, as males were required to do. Apparently, they congregated outside the magistrate's court until dispersed by the police by the use of tear gas. Barzilay testified to a boycott of buses by the Africans in 1957, which resulting in sporadic fighting, and described a riot 6 miles west of Durbin in which African women were protesting the sale of beer to their husbands, in competition with liquor of their own brewing. Street fights among the Africans were of common occurrence. The police frequently chased Africans who had been detected stealing goods. It was not safe for white women to walk down main streets of Johannesburg at night unaccompanied by a male. He did not testify to any attacks upon white men, women or children. He did not testify to any disturbance in the district in which plaintiff resides. He traveled through Northern and Southern Rhodesia, Portuguese East Africa, Kenya, Nairobi, Leopoldville, the Congo and South Africa. The natives are not allowed to carry firearms, and although many people carried guns, including a half dozen women he had seen over a 13-year period, he did not testify to any occasion in which any of these guns was used. There was a certain amount of strain resulting from the fact that the Government had a policy of apartheid and maintains segregation in housing, transportation and almost all other situations. Since returning to the States, Mr. Barzilay has engaged in lecturing on South Africa and anticipates some sort of revolution or uprising of the African people. The court could have believed that as a broadcaster Mr. Barzilay had a sharp eye for incidents that would furnish exciting material for his broadcasts. It appears from the record that the court observed from his testimony and photographs in evidence that the police were always on hand and able to maintain control.

The only witness called by plaintiff to give testimony respecting the conditions in Johannesburg was Mrs. Narcisse Ford. She testified she was a travel agent and that she had been contacted by plaintiff's attorney only the day before she

gave her testimony. In September 1960 she visited in the Union of South Africa and spent three or four days alone in Johannesburg before she was joined by a group of travel agents who had been invited by South African interests to take a tour which took them to many of the principal cities. She came back to Johannesburg for brief stays on other occasions; the trip lasted from September 25 to October 12; in the mornings she was with other members of the party and in the afternoons they were on their own; she walked the streets of Johannesburg alone in the daytime and with a male companion at night; neither in Johannesburg nor in the other cities she visited did she see any riots or any violence, nor anyone inflicting any harm upon a native; she saw nothing which caused her to be fearful for her safety. A part of her expenses was paid by the Union of South Africa.

The trial court was convinced, and expressed the belief, that there was no breakdown of law and order in Johannesburg and that, in fact, the government, through the police, was competent to cope with the disturbances created by the natives. The court had good reason to believe that plaintiff would use every means to protect his daughters from harm, and that while with him they would be in no danger.

It was urged by plaintiff that it was inconvenient for him to come to California to visit his daughters, principally because he would be allowed to bring with him only $1,750, which he considered to be insufficient to meet his own expenses and furnish entertainment for the daughters. We doubt that the court was impressed by this testimony as a reason for directing that the daughters travel to Johannesburg. The court had better reasons.

Plaintiff is engaged in the candy business with his father. He has a financial worth of about $275,000 and an annual income, after taxes, of $15,000. He is unmarried and lives in a four-bedroom apartment in a modern residential district. Most of the time his mother lives there and they maintain two servants. The windows of his apartment are not barred; his servants are trustworthy and live on the premises; there is no disorder in the district in which he resides. It was conceded at the trial that plaintiff is a fit person to have the care of his daughters, that he has a great love for them and they entertain strong affection for him. In 1959 his mother visited with defendant and the children in Burbank. Whenever the daughters are in Johannesburg they will be under the care of himself and his mother. Although no contention is

made that it would be unsafe for the children to travel, there was evidence from representatives of an airline that they would be looked after with the greatest care upon their journeys.

It is clear from the record that the court did not base its order upon the mere convenience of the father, but was rather of the view that the children would benefit from an opportunity to know and understand their father better and to learn to respect and trust him if they could be with him in his home. It is true that plaintiff has never been restricted in having the company of the daughters upon his visits with them in their home, but their time has been divided between him and their mother, and they could learn nothing of the conditions in his home in Johannesburg, of his associates there and his standing in the community. It was reasonable for the court to believe they will derive lasting benefit from their visits with their father.

Defendant offered in evidence newspaper clippings, newspaper photographs and material for radio teletype broadcasts which were produced by the witness Barzilay, and which purported to show disturbances among the native people. These were events which Barzilay had described. One magazine picture which showed a group of women protesting an order that they carry identification papers was introduced without objection by plaintiff. It appeared in this picture that the women were under the control of the police. Plaintiff's objection to a news article of which the picture was a part was sustained. Other photographs from a magazine of occurrences which Barzilay had described were received in evidence without objection from plaintiff. Mr. Barzilay was shown what purported to be a teletype sent from Johannesburg by one Richard Massicary, which supposedly was received in New York and was transmitted to subscribers of the news service, one of whom was Barzilay. He did not know Massicary and had never heard of him. The teletype purported to give an account of a political demonstration when Prime Minister Hendrik Verwoerd was welcomed upon his return from London and made speeches to a great assemblage. It was an account also of fist fights in the crowd. The message had been sent to Barzilay to be used in his broadcasting. Another article which Barzilay produced was taken from the London Sunday Express. It purported to be written by a Kenneth Ames and was a long, detailed account of his personal experiences in Johannesburg, and his analysis of the

political situation and differences between the white and native inhabitants. Numerous other articles from Los Angeles papers which related to violent political upheavals were offered in evidence. These were replete with purported statements of numerous people on political subjects and, generally, upon conditions in South Africa. Counsel stated that the articles were not offered for the purpose of proving the truth of the facts stated, but upon the unique theory that the court would know judicially, as a matter of current history, that violent riots had been taking place in Johannesburg and elsewhere in South Africa, and that the court should read the articles to "refresh its memory of the facts of which the court could take judicial notice." Defendant has stated no rule of law which even remotely tends to support her theory of admissibility of the newspaper articles. Her counsel appears to argue that the court can take judicial notice of whatever is currently happening anywhere in the world, if it is publicized through the mediums of the newspapers, radio broadcasting, television and teletype messages. Plaintiff's objection to the offers were properly sustained. It is of common knowledge that there are many areas throughout the world that are beset with political and racial conflicts, but this is mere knowledge of general conditions that have become notorious, and it does not extend to isolated events that occur from day to day. Defendant's theory of the efficacy of the offered evidence defeats itself. Matters that are known judicially need not be proved. And since the articles were not offered as proof of the truth of their contents, for the reason that they were pure hearsay, they could have served no purpose whatever.

The next contention to be noticed is that the court prejudged the case and deprived defendant of a fair and impartial trial. This contention is based upon wholly unsubstantial grounds. The record does not disclose any exhibitions of prejudice of the court toward defendant and her counsel, but rather the bald accusations of defendant and her counsel that their case had been prejudged.

The usual complaint of a litigant of the court's actions is that he was not given a full and fair opportunity to present all his evidence, but it is clear that no such complaint could fairly be made by defendant in the present case. All the relevant and material evidence could have been produced in two or three days, whereas the trial dragged on through eight days. By far the greater part of the evidence of defendant had no important bearing upon the material issues. In view

of the contentions of defendant that the court was unfair to her it is important to look at the record for verification of her claims. We have referred to the Rethorst letter, which consumed much of the court's time, when it was apparent from the evidence in the former hearing that defendant could produce no evidence whatever connecting plaintiff with the writing of the letter. Evidence of conversations between plaintiff and defendant and her husband respecting child support were equally irrelevant, when it was known by all parties that plaintiff was willing to support the children and had been sending about $138 per month for their support, which was all he was permitted by the South African government to send.

Another matter that was gone into at great length in the late stages of the trial was the fact that in 1957, when plaintiff was visiting in California, he accompanied some friends to Las Vegas and there incurred losses of $2,000. The ostensible purpose of the development of this fact by defendant was to prove that plaintiff not only had the amount to spend to which he testified, but $2,000 in addition. The facts were that plaintiff had only $300 when he went to Las Vegas; a friend stood good for his losses, was given a note for the amount and the same was not repaid until the friend came to South Africa. These facts were made known to defendant through plaintiff's testimony in the earlier hearing. Defense counsel insisted upon bringing out the fact that the money was repaid, and only succeeded in proving that plaintiff did not have the money in California. During a discussion of the materiality of the evidence of the Las Vegas incident, the court remarked ''And because he can afford it, a father must come half-way around the world to visit his children. It is all to that point. MR. SAUNDERS: I suppose that will be stipulated, won't it?'' Defendant's attorney offered to prove that when defendant wanted to leave South Africa in 1953, and in order to be allowed to leave she promised the American Consul that she would return the children to South Africa. The offer was not objected to and counsel then inquired of defendant about some difficulty she had with her husband over her passports which he took from her and then returned. The court stated: ''This is a great waste of the Court's time. I wish you would get down to some issues that are material,'' whereupon defendant stated: ''Well, sir, have you already made your judgment against me?'' and the court said: ''Quiet, please.'' When defendant was questioned about the same matter on cross-examination, the court stated: ''It is all immaterial

anyhow in my view'' and defendant said ''Then you have already made your decision on my case, Sir?'' and the court stated ''I might caution you against any remarks like that, Madam, again.''

The criticism of the court's remarks which are cited as an exhibition of prejudice is merely a denial of the court's right to exercise any control over the course of the trial. We must say that the power was used sparingly.

Upon the motion of defendant for a new trial her attorney asserted in argument that the court had prejudged the case, was biased toward defendant throughout the trial and that such was not only his own belief but it was the belief of the friends of Mrs. Goldstein, who attended the trial, and that ''they all stated that your Honor had already made up your mind in the matter. . . . So I am satisfied that everyone this side of the counsel table knew well in advance of the final submission of this case to your Honor that the defendant was not going to prevail and that the plaintiff was.'' The record does not support those statements, but upon the contrary, it demonstrates that the court was unduly liberal in permitting defendant to consume far more than a fair share of the eight days that were spent in the trial. It would seem that the attorney's disrespectful criticism of the court was delivered under the mistaken belief that he had some duty to express the accusations of his client and her friends, as if they were his own. Whatever his motive, his conduct was unjustified.

Defendant has listed in the opening brief a few instances in which the court ruled adversely to defendant's questions and offers of proof. We have examined these and find that the rulings were not erroneous.

The arguments of counsel are necessarily addressed to the question whether the judgment was in abuse of the court's discretion, in view of the rule that the court's directions with respect to the custody of children may not be disturbed in the absence of a clear showing of abuse of discretion. (*Cowen* v. *Cowen*, 100 Cal.App.2d 366 [223 P.2d 666]; *Munson* v. *Munson*, 27 Cal.2d 659 [166 P.2d 268]; *DeBoynton* v. *DeBoynton*, 137 Cal.App.2d 106 [289 P.2d 868].)

The court was called upon to make a difficult decision. The importance of the question whether the children could safely visit with their father was the reason for the court's liberality in the receipt of evidence during the protracted trial. When the court was convinced that the children would be well cared for by their father, and in no danger of harm,

the fact that they must travel a great distance, and live under strange conditions, did not preclude the court from regulating their custody as provided in the judgment. The fact that the parents live in opposite parts of the world does not, of itself, deprive their children of the benefits afforded by visiting with both the mother and the father. (*Blackwell* v. *Blackwell,* 190 Cal.App.2d 520 [12 Cal.Rptr. 201] ; *Gantner* v. *Gantner,* 39 Cal.2d 272, 280 [246 P.2d 923].)

There is no merit in the contention that the findings of probative facts are conflicting.

As previously stated, the judgment contains elaborate provisions with respect to the manner in which it is to be executed. Defendant does not suggest any modification of its terms in the event it is not reversed.

The portions of the judgment appealed from are affirmed.

Ford, J., and Files, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 13, 1962.