NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-0785-14T1

BRYAN ALINTOFF,

 Plaintiff-Respondent,

v.

RACHEL B. ALINTOFF,

 Defendant-Appellant.
__________________________________

 Argued May 11, 2016 – Decided May 18, 2017

 Before Judges Ostrer, Haas and Manahan.

 On appeal from the Superior Court of New
 Jersey, Chancery Division, Family Part,
 Monmouth County, Docket No. FM-13-545-12.

 Caryl Wolfson Leightman argued the cause for
 appellant (Howard W. Bailey and Ms. Leightman,
 attorneys; Mr. Bailey and Ms. Leightman, on
 the briefs).

 Clara S. Licata argued the cause for
 respondent.

 The opinion of the court was delivered by

OSTRER, J.A.D.

 In this divorce case, defendant Rachel B. Alintoff appeals

from the trial court's final child custody order, pursuant to Rule
5:8-6, awarding plaintiff Bryan Alintoff primary residential

custody of the parties' son, Matt.1 The child was born in 2009,

two years after the parties married, and two years before plaintiff

filed for divorce. Defendant does not challenge the award of

joint legal custody to both parents. The custody trial, which

spanned twenty-eight days over several months, proceeded while

resolution of equitable distribution and permanent alimony was

stayed due to defendant's September 2012 bankruptcy filing.

However, defendant appeals from the trial court's order

terminating plaintiff's obligation to pay unallocated pendente

lite support to defendant, and requiring defendant to pay child

support to plaintiff. She contends the court erred in its

imputation of income to her, and violated the bankruptcy stay by

ordering her to pay child support. Defendant also appeals from

the trial court's order denying defendant's recusal motion. Having

considered defendant's arguments in light of the record and

applicable legal principles, we affirm, substantially for the

reasons set forth in Judge Linda Grasso Jones's comprehensive

written decisions.

1
 We utilize a pseudonym to protect the child's privacy.

 2 A-0785-14T1
 I.

 The trial court reviewed the facts in detail. It suffices

here to highlight the following. In September 2011, after a period

of marital difficulties, defendant vacated the marital home in New

Jersey with two-year-old Matt, many of his belongings, passport,

and other personal documents. She gave no advance notice to

plaintiff. She relocated to her parents' home in Brooklyn, and

never returned. Defendant claimed she feared for Matt's safety

if left with plaintiff since he possessed a gun.2 However, the

court concluded, upon review of the evidence, that she withheld

the child to retaliate against plaintiff, because she believed

plaintiff was having an affair and hiding assets from her with his

business partner.

 Soon thereafter, plaintiff filed his divorce complaint and

an order to show cause to compel defendant to return Matt. On

September 28, 2011, the parties entered into a consent order that

provided the parties shared "joint legal and . . . physical

custody," and granted plaintiff parenting time from Friday morning

2
 Plaintiff used the gun recreationally at a shooting range and
did not keep ammunition at home.

 3 A-0785-14T1
to Monday morning.3 At the time, plaintiff worked away from home,

in finance, but returned home around 3:00 p.m., and defendant was

a stay-at-home caregiver. Eventually, however, plaintiff shifted

to working primarily from home; defendant moved out of her parents'

home and into her own apartment in Brooklyn, and began working

part-time.

 In the months that followed Matt's removal and the

commencement of divorce proceedings, defendant took various steps

that were at odds with shared decision-making involving Matt. In

October 2011, she obtained an order of protection from a New York

court, barring plaintiff from interfering with defendant's care

and custody of Matt, but that court soon thereafter dismissed the

action for lack of jurisdiction.4 Defendant also threatened

litigation against the operator of a gymnastics class that

plaintiff proposed to send Matt to on Saturdays, when he had

3
 The order required plaintiff to store the handgun at the shooting
range. However, after he learned he could not do so, he sold the
gun.
4
 The New York court dismissed the action on October 11, 2011.
After defendant denied plaintiff his parenting time for the
weekend beginning on October 7, plaintiff obtained an emergent
order from one of Judge Grasso Jones's predecessors, which required
defendant to return Matt to New Jersey, granted plaintiff temporary
physical and legal custody, and granted defendant supervised
parenting time. We later vacated that order upon defendant's
emergent appeal and subjected the parties to the September 2011
consent order.

 4 A-0785-14T1
parenting time. The parties exchanged numerous texts that the

trial court found demonstrated defendant's unwillingness to meet

plaintiff directly to discuss Matt's care. Defendant registered

multiple complaints about plaintiff with the Division of Youth and

Family Services, which ultimately found no reason for concern.

She also alleged, but failed to prove, plaintiff had an alcohol

problem.5

 In December 2011, the court granted in part defendant's motion

for pendente lite support, ordering plaintiff to cover defendant's

schedule B automobile expenses, and pay $1157 in unallocated

support to defendant.6 In the same order, the court granted

plaintiff's motion to enjoin either party from enrolling Matt in

a school or activity without the other's written consent.

 Questions arose regarding Matt's development and whether

certain interventions were warranted. Defendant obtained the

evaluation of a speech therapist without plaintiff's

participation. With plaintiff's consent (conveyed by his

attorney), the therapist then treated Matt for six months. In

5
 In particular, she alleged plaintiff had an emergent, alcohol-
related hospital admission in New York. Plaintiff retained an
expert who confirmed that none of the over thirty hospitals in New
York had any records of the alleged admission.
6
 The court designated the entire amount as non-deductible to
plaintiff and non-taxable to defendant.

 5 A-0785-14T1
early 2013, defendant unilaterally obtained evaluations of Matt

from a New York City Board of Education contractor, OMNI Childhood

Center of Brooklyn. Without consulting with plaintiff or notifying

the court, defendant enrolled Matt in a Brooklyn pre-school geared

for children with special needs, which provided occupational,

physical and speech therapy. After learning of his enrollment

from Matt, plaintiff consented to his son's continued

participation rather than disrupt it. In the summer of 2013,

defendant also enrolled Matt in a summer school without consulting

plaintiff.

 Plaintiff invited defendant to attend an evaluation of Matt

by a New Jersey licensed occupational therapist plaintiff

selected, Ursula Shah. Defendant appeared at the therapist's

office as scheduled, but instead of participating, she objected

to the session proceeding. Plaintiff had to obtain a court order

to enable the evaluation to proceed.

 Other evaluations were performed during the course of the

litigation, some specifically for the purpose of trial. The

parties jointly retained Patricia Baszczuk, Ph.D., who completed

a 162-page custody evaluation in January 2013, based on a more

than year-long process that included numerous interviews of the

parties; observations of each party with Matt; psychological

testing; questionnaires of numerous friends and family members;

 6 A-0785-14T1
and review of Matt's records, communications between the parties,

and videotapes of their interactions when transferring Matt. The

trial court found Dr. Baszczuk's report and testimony credible and

helpful.

 After evaluating the statutory factors, N.J.S.A. 9:2-4, Dr.

Baszczuk opined that it would serve Matt's best interests to grant

plaintiff primary residential custody.7 Among other things, Dr.

Baszczuk concluded that defendant was less willing or able to

compromise and coparent than plaintiff. She tended to make

unsupported accusations. Tension arose when she transferred Matt

to plaintiff and she exposed Matt to her anger. She was consumed

by the divorce-related conflict, and her family members were

actively engaged in her cause.

 Dr. Baszczuk opined that plaintiff was better able to separate

himself from the litigation and focus on parenting strategies.

Dr. Baszczuk recommended the appointment of a parenting

coordinator. She also recommended that plaintiff attend sessions

with a therapist to deal with his anger. She recommended that

defendant "undergo a neuropsychological evaluation to investigate

possible underlying conditions for her emotionally charged and

unregulated behavior toward [plaintiff]; tendencies toward cyclic

7
 Plaintiff unsuccessfully sought pendente lite implementation of
Dr. Baszczuk's recommendations.

 7 A-0785-14T1
emotional outbursts; [and] recurring and problematic information

processing issues."

 Defendant also obtained her own custody expert, Maria

Salvanto, Ph.D., who opined that defendant should receive primary

residential custody. However, the court gave no weight to Dr.

Salvanto's opinion because, among other reasons, she did not comply

with the Specialty Guidelines for Psychologists Custody/Visitation

Evaluations promulgated by the New Jersey Board of Psychological

Examiners.8

 In the midst of the trial, the parties jointly retained

neurologist, Judith Bluvstein, M.D., to provide a litigation

opinion after a pediatric neurologist, Yuri Brosgol, M.D.,

diagnosed Matt with autism spectrum disorder (ASD) or Asperger's

syndrome.9 Dr. Bluvstein opined that Matt's "constellations of

symptoms . . . are more indicative of frontal lobe dysfunction

than ASD/Asperger's." She diagnosed Matt with frontal lobe and

8
 The court was critical of the expert's failure to address all
the factors in N.J.S.A. 9:2-4(c), her minimal contacts with
plaintiff, and her failure to review all relevant documents.
9
 Both parties attended Dr. Brosgol's evaluation of Matt, which
was not performed for litigation purposes, but was conducted while
the trial was ongoing. He found that Matt presented "features
[that] fit the criteria for autistic spectrum disorder" and "[h]is
high cognitive functioning skills and peculiar rigid
preoccupations . . . resemble what was previously known as
Asperger's syndrome."

 8 A-0785-14T1
executive function deficit, language development disorder, and an

immature self-regulatory system. She recommended Matt have an MRI

and conduct a Video EEG Monitoring Test (VEEG) at a sleep center.

Dr. Bluvstein's report was admitted into evidence by consent.

 In her ninety-page written decision, Judge Grasso Jones

considered each of the statutory factors under N.J.S.A. 9:2-4.

 [1] the parents' ability to agree, communicate
 and cooperate in matters relating to the
 child; [2] the parents' willingness to accept
 custody and [3] any history of unwillingness
 to allow parenting time not based on
 substantiated abuse; [4] the interaction and
 relationship of the child with its parents and
 siblings; [5] the history of domestic
 violence, if any; [6] the safety of the child
 and the safety of either parent from physical
 abuse by the other parent; [7] the preference
 of the child when of sufficient age and
 capacity to reason so as to form an
 intelligent decision; [8] the needs of the
 child; [9] the stability of the home
 environment offered; [10] the quality and
 continuity of the child's education; [11] the
 fitness of the parents; [12] the geographical
 proximity of the parents' homes; [13] the
 extent and quality of the time spent with the
 child prior to or subsequent to the
 separation; [14] the parents' employment
 responsibilities; and [15] the age and number
 of the children.10

 The court recognized that truly shared residential custody

was impractical, given defendant's plan to remain in Brooklyn and

10
 We utilize the numbering adopted by the trial court.

 9 A-0785-14T1
plaintiff's plan to remain in New Jersey (factor 12). Thus, the

court had to designate one parent as the primary residential

parent.

 Many of the factors did not favor either party. The court

found that both parents deeply loved their son, had a close and

loving relationship with him (factor 4), and were willing to accept

custody (factor 2). Both parties were active and involved parents

before the separation; the judge found that plaintiff, even when

he worked outside the home, returned by 3:30 p.m. (factor 13).

Although the court noted that plaintiff now worked from home, and

defendant worked outside the home, neither parent's employment

responsibilities interfered with their ability to serve as the

parent of primary residence (factor 14).

 There was no history of domestic violence (factor 5), and

neither posed a safety risk (factor 6). The court noted

plaintiff's sale of his handgun and rejected defendant's claims

of substance abuse. The court found that Matt had special needs,

although the trial evidence did not disclose a definitive diagnosis

(factor 8). Plaintiff was slower than defendant to recognize

Matt's needs for therapy, yet the court found that both parties

would meet his needs. The court noted that plaintiff recognized

the value of Matt's pre-school program and consented to it after

learning about it after-the-fact, and defendant was a "wonderful

 10 A-0785-14T1
champion for the child in seeking out educational and therapeutic

opportunities." Matt's age did not favor one parent over the

other (factor 15). Although defendant had already enrolled Matt

in a Brooklyn kindergarten program to commence in the school year

following trial (factor 10), the court found that Matt did not

need to remain enrolled for continuity or quality reasons. He

would be graduating from his pre-school in any event.11

 What tipped the balance in favor of plaintiff was the court's

finding that if granted primary residential custody, plaintiff was

more likely than defendant to coparent and work cooperatively.

The court reviewed the parties' voluminous text messages and their

parental performance during the pendente lite period. The judge

found that neither parent was blameless. She did not withhold

criticism of certain communications made by plaintiff. Yet, with

respect to their "ability to agree, communicate and cooperate"

(factor 1), the judge found:

 Husband is more likely to reach out to Wife
 to try and resolve matters. Based upon the
 evidence presented, Wife has not exhibited
 that willingness. The court finds that Wife
 will not work with Husband toward a negotiated
 resolution on issues concerning the child.
 Wife behaves as if she is entitled to "make
 the call" on all issues having to do with the
 child. She does not respect Husband's rights

11
 Other factors were irrelevant, such as the preferences of the
child (factor 7) — he was too young to express one — and his
relationship with siblings (factor 4) — he had none.

 11 A-0785-14T1
 to participate in important decisions
 concerning the child. If this was the
 behavior only when this litigation began, it
 would not be of such concern, but the parties
 have been separated for three years, and
 Wife's behavior has not changed; if anything,
 she has taken even greater steps in forcing
 Husband out of the picture in making decisions
 concerning the parties' child.

 The court considered defendant's tendency to act

unilaterally, in connection with Matt's educational needs (factor

10). Although she was a "staunch advocate" for Matt, the court

found she "parents as if she is the only parent." Notwithstanding

that both parties had stable home environments (factor 9), the

court expressed concern that defendant's immediate family did not

support coparenting.12 The court was also critical of defendant's

interference with plaintiff's exercise of parenting time in the

early stages of the litigation (factor 3), although the court

recognized that the both parties subsequently abided by the

parenting time order.13 With respect to each parties' fitness to

12
 The court cited defendant's brother's attempt, in a meeting with
plaintiff, to get plaintiff to drop his request for custody; and
a letter from defendant's father to plaintiff's former attorney,
threatening to bring charges against him.
13
 The court noted that plaintiff voluntarily returned Matt on
Sunday nights, forfeiting his Sunday overnight parenting time,
rather than force Matt to awake very early Monday morning for the
return trip to Brooklyn and 8:30 a.m. drop-off. Defendant rejected
plaintiff's request to alter his parenting time period to Thursday
evening to Sunday evening.

 12 A-0785-14T1
serve as the primary residential parent (factor 11), the court

reviewed in detail the evidence concerning plaintiff's alleged

substance abuse and found the allegation unsupported. On the

other hand, the court found that defendant was willing to sabotage

plaintiff's efforts — such as her opposition to Matt's gym class

and Dr. Shah's evaluation — even if contrary to Matt's interests.

 The court designated plaintiff as the parent of primary

residence; defendant as the parent of alternative residence; and

granted defendant parenting time three out of every four weekends,

from the end of the Friday school day until Sunday at 6:00 p.m.,

plus Wednesday afternoon parenting time. Summer vacation time was

to be divided equally and the parties would alternate significant

holidays. Consistent with Dr. Baszczuk's recommendation, the

court ordered plaintiff to attend therapy "to address recurrent

issues and allegations of anger management[,]" and defendant was

required to undergo a neuropsychological evaluation, and attend

individual therapy. The parties were required to retain a

parenting coordinator and to utilize a specified calendaring

system, to assure they were informed of Matt's activities,

appointments and events.

 Pending defendant's appeal, and pursuant to a limited remand,

the court later granted plaintiff's motion to terminate his

pendente lite unallocated support obligation to defendant and

 13 A-0785-14T1
awarded plaintiff child support. The court averaged plaintiff's

income over a multi-year period, and imputed an income of $70,000

to defendant after finding defendant was voluntarily

underemployed, and set child support at $124 a week. The court

also denied defendant's recusal motion, which was based on her

filing a federal civil rights suit against the judge and others.

Defendant subsequently was permitted to amend her notice of appeal

to include this order.

 II.

 In a custody dispute, the trial court's "primary and

overarching consideration is the best interest of the child."

Kinsella v. Kinsella, 150 N.J. 276, 317 (1997). A trial judge is

obliged to consider the factors identified in N.J.S.A. 9:2-4 and

other relevant factors, and set forth its reasons for its decision

pursuant to N.J.S.A. 9:2-4(f). See id. at 316-17; see also Hand

v. Hand, 391 N.J. Super. 102, 105 (App. Div. 2007) ("Custody issues

are resolved using a best interests analysis that gives weight to

the factors set forth in N.J.S.A. 9:2-4(c).").

 In considering defendant's challenge to the court's custody

order, we are mindful of our limited scope of review. We defer

to the trial judge's fact-findings, and shall not disturb them

unless convinced "they are so manifestly unsupported by or

inconsistent with the competent, relevant and reasonably credible

 14 A-0785-14T1
evidence as to offend the interest of justice." Abouzahr v.

Matera-Abouzahr, 361 N.J. Super. 135, 151 (App. Div.) (quoting

Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484

(1974)), certif. denied, 178 N.J. 34 (2003). "That deference is

especially appropriate 'when the evidence is largely testimonial

and involves questions of credibility.'" MacKinnon v. MacKinnon,

191 N.J. 240, 254 (2007) (quoting Cesare v. Cesare, 154 N.J. 394,

412 (1998)). Our deference is also rooted in our respect for the

Family Part's special expertise in family matters. Cesare, supra,

154 N.J. at 411-12. Absent compelling circumstances, we are not

free to substitute our judgment for that of the trial court, which

has become familiar with the case. Schwartz v. Schwartz, 68 N.J.

Super. 223, 232 (App. Div.), certif. denied, 36 N.J. 143 (1961).

Nonetheless, we owe no special deference to the trial court's

legal conclusions. Manalapan Realty, L.P. v. Twp. Comm. of

Manalapan, 140 N.J. 366, 378 (1995).

 On appeal, defendant revisits and reinterprets evidence in

the record; challenges the court's reliance on Dr. Baszczuk's

expert opinion, whom defendant attempts to discredit with ad

hominem attacks and questions of her impartiality; and asks us to

reach conclusions different from the trial court with respect to

defendant's willingness to coparent and cooperate with plaintiff,

and to secure the educational and therapeutic programs that Matt

 15 A-0785-14T1
needs. In short, defendant asks us to substitute the trial court's

judgment with our own.

 That we shall not do. Given our standard of review and having

carefully reviewed defendant's contentions with respect to the

award of primary residential custody, we affirm substantially for

the reasons set forth in Judge Grasso Jones's comprehensive written

opinion. We discern no abuse of discretion in the court's decision

to credit Dr. Baszczuk. See Fox v. Twp. of W. Milford, 357 N.J.

Super. 123, 131 (App. Div.), certif. denied, 176 N.J. 279 (2003).

We are satisfied that substantial credible evidence supports Judge

Grasso Jones's credibility findings, her findings with respect to

the statutory factors, and her ultimate conclusion regarding the

custodial arrangement that will best serve Matt's interest.

 We briefly address defendant's assertion that the court

committed reversible error by barring the testimony of proposed

experts and the admission of certain reports regarding Matt's

disabilities. These include: two undated reports of Candace

Toussie, the speech language pathologist; the OMNI evaluation

(consisting of a summary report); the social history report

prepared by a licensed clinical social worker, Lea Mendelsohn,; a

psychological evaluation of Matt by Shulamis Frieman, Psy.D.; a

progress report by Matt's special education teacher at Special

 16 A-0785-14T1
Sprouts, Lauren V. Zunde; and Dr. Brosgol's neurologic

evaluation.14

 First, we discern no error in the court's use of discretion

to bar Toussie's reports and the OMNI evaluation, as well as its

decision to bar the Special Sprouts witnesses from testifying as

experts — since they were not properly disclosed as such in

discovery. See State v. Heisler, 422 N.J. Super. 399, 414-15

(App. Div. 2011). The court also barred Dr. Brosgol's report

because it was not prepared for litigation purposes. However, the

court did not bar these professionals from testifying as fact

witnesses and defendant did not avail herself of this option.

Furthermore, the court permitted defendant to call an expert

witness to rebut Dr. Bluvstein's opinion, which was obtained in

the midst of trial. She declined.

 Defendant misplaces reliance on Kinsella, supra, for the

proposition that the court was obliged to relax rules of evidence

to admit these reports. We recognize that "[o]ne consequence of

the special role of the courts in custody disputes is that

14
 We granted defendant's post-argument motion to expand the record
to include these documents, which defendant proffered before the
trial court. We also permitted defendant to supplement the record
with documents that were not even offered at the trial court,
including subsequent Special Sprouts progress reports and Matt's
Individualized Education Plan, prepared by the New York City
Department of Education.

 17 A-0785-14T1
evidentiary rules that are accepted as part of the adversarial

process are not always controlling in child custody cases."

Kinsella, supra, 150 N.J. at 318. The trial court necessarily

relies on mental health and other experts to ascertain the child's

best interests. Id. at 319-20. Yet, in Kinsella, the Supreme

Court also recognized the significant limitations in utilizing the

opinions of treating psychologists, as opposed to evaluations

prepared by litigation experts. Id. at 320-21. Notably,

"[e]valuators are more likely than treating psychologists to be

objective." Id. at 320. Therefore, the Court held that "the

first source of information about the parents' mental health should

be the independent experts appointed by the courts or hired by the

parties for the purpose of litigation, rather than the

professionals who have established relationships with the

parties." Id. at 328. Although the treating professionals here

relate to the child's health, not the parents', the principle in

Kinsella still applies. The trial court's decision to bar expert

opinions that were not solicited for litigation purposes and that,

in some cases, were solicited without plaintiff's participation,

was not at odds with Kinsella.

 Second, and more importantly, based on our examination of the

precluded reports, the exclusion of the documents was not "of such

a nature as to have been clearly capable of producing an unjust

 18 A-0785-14T1
result." R. 2:10-2. As discussed above, the factor that tipped

the balance in favor of designating plaintiff as the primary

residential parent was the court's finding that he was more likely

to cooperate and coparent than defendant. The court found that

both parents recognized Matt had special needs. Plaintiff

recognized the value of the Special Sprouts program and consented

to Matt's attendance, notwithstanding defendant's failure to

consult with him. Although Dr. Bluvstein questioned Dr. Brosgol's

assessment of ASD and Asperger's, Dr. Bluvstein nevertheless

discerned significant issues of concern, identified a frontal lobe

dysfunction, and recommended a MRI and an overnight VEEG exam. In

short, the excluded documentary evidence does not undermine the

court's findings that Matt has special needs; both parents

recognize that, and are prepared to address them; and plaintiff

is more likely than defendant to do so in a cooperative effort,

if granted primary residential custody.

 We also shall not disturb the trial court's order on limited

remand, compelling defendant to pay child support that was

calculated based on defendant's imputed annual income of $70,000

and plaintiff's four-year averaged annual income of $152,000. We

review the court's determination for an abuse of discretion, see

Innes v. Innes, 117 N.J. 496, 504 (1990), and we find none.

 19 A-0785-14T1
 We reject defendant's procedural arguments. First, the

automatic stay imposed by defendant's bankruptcy filing did not

bar the court from awarding child support. See 11 U.S.C.A. §

362(b)(2)(A)(ii) (automatic stay does not stay "the commencement

or continuation of a civil action . . . for the establishment or

modification of an order for domestic support obligations"); Henry

J. Sommer & Margaret Dee McGarity, Collier Family Law and the

Bankruptcy Code ¶ 5.03[3] (Matthew Bender); cf. Clark v. Pomponio,

397 N.J. Super. 630, 642-43 (App. Div.) (addressing alimony),

certif. denied, 195 N.J. 420 (2008). Second, the court did not

exceed the scope of our limited remand; we authorized the court

to address the "issue of pendent[e] lite support," which

encompassed pendente lite child support.

 We also discern no error in the court's finding that

defendant, a college graduate with a prior history of full-time

employment, was voluntarily underemployed as a part-time waitress

working two nights a week. Defendant argues that the figure

imputed to her was excessive. At a subsequent plenary hearing on

the parties' financial issues, defendant will have an opportunity

to present additional competent evidence of her skills,

employability and earning capacity. Upon such a showing, a

downward adjustment of the $70,000 imputed figure may be warranted.

See Mallamo v. Mallamo, 280 N.J. Super. 8, 12 (App. Div. 1995)

 20 A-0785-14T1
(noting that pendente lite support is typically decided on a

limited record). However, in the absence of a full record, we

shall not disturb the trial court's imputation of income based on

average wages of persons in New York City performing jobs related

to her past lines of work. See Sternesky v. Salcie-Sternesky, 396

N.J. Super. 290, 307-08 (App. Div. 2007) (stating that

"[i]mputation of income is left to the sound discretion of the

trial judge based on the evidence presented").

 Finally, we discern no merit to defendant's contention that

Judge Grasso Jones was obliged to recuse herself once defendant

decided to file suit against her in federal court. Defendant does

not even include in the record a copy of the complaint that she

contends justified recusal. We need not try to review an issue

"when the relevant portions of the record are not included." Cmty.

Hosp. Grp., Inc. v. Blume Goldfaden, 381 N.J. Super. 119, 127

(App. Div. 2005); see R. 2:6-1(a) (stating appellant must include

in the appendix "such other parts of the record . . . as are

essential to the proper consideration of the issues").15

15
 Based on the trial court's decision rejecting defendant's
recusal motion, we understand that defendant also named the entire
Monmouth County judiciary, and included bizarre allegations that
the defendants were guilty of racketeering, "operat[ed] a cottage
industry and Star Chamber for profit and sadism," and engaged in
"a seditious conspiracy to undermine and usurp the Federal
government, through a calculated system of fraud, eugenics, and

 21 A-0785-14T1
 In any event, based on what has been presented before us, no

"reasonable, fully informed person [would] have doubts about the

judge's impartiality[.]" State v. Dalal, 221 N.J. 601, 606 (2015).

Here, defendant filed a lawsuit against the judge days before a

hearing on plaintiff's motion to terminate pendente lite support

and then immediately called for her disqualification. As such, a

"reasonable, fully informed person" would suspect the filing was

intended to "manipulate the judicial system and engage in forum

shopping," id. at 607, particularly in light of defendant's past

unsuccessful efforts to litigate her dispute in New York.16

 To the extent not addressed, defendant's remaining points

lack sufficient merit to warrant discussion in a written opinion.

R. 2:11-3(e)(1)(E).

 Affirmed.

social engineering; and dealing in obscene matters of human
trafficking, child pornography and child prostitution . . . ."
16
 In addition to her failed effort to secure an order of
protection, defendant also filed an unsuccessful motion to change
venue before trial.

 22 A-0785-14T1