**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2183-15T2

KIMBERLY LANZANA,

    Plaintiff-Respondent,

v.

STEPHAN DEBELLE DUPLAN,

    Defendant-Appellant.

_____

Submitted February 28, 2017 — Decided March 29, 2017

Before Judges Ostrer and Vernoia.

On appeal from the Superior Court of New
Jersey, Chancery Division, Family Part, Bergen
County, Docket No. FD-02-1239-13.

Sosis Law, LLC, attorneys for appellant
(William N. Sosis, on the briefs).

Laufer, Dalena, Cadicina, Jensen, & Boyd, LLC,
attorneys for respondent (Mario N. Delmonaco,
of counsel and on the brief).

PER CURIAM

    In this non-dissolution matter, defendant Stephan Debelle Duplan appeals from the trial court's December 17, 2015 order that: (1) denied his motion to reduce his child support obligation for his son; (2) denied his motion to exercise vacation-parenting

time in France; and (3) ordered that defendant and son enroll in reunification therapy in New Jersey, as a prerequisite to any parenting time. We affirm the order as it pertains to child support, because defendant failed to comply with Rule 5:5-4(a) and failed to demonstrate just cause for voluntarily reducing his income. We reverse the order relating to parenting time, as the record lacks sufficient evidence supporting the court's conclusion that defendant and son required therapy.

I.

We discern the following essential facts from the documentary record, and brief testimony of defendant. The parties separated in May 2013 after a nine-year relationship. They began living together in 2005, and their son Louis[1] was born in January 2007. Plaintiff was a store manager. Although he lacked a college degree, defendant worked for Unilever as a security information technology (IT) manager. Defendant was a French citizen, but lived in the United States since he was twenty-five. His parents lived in France, and the parties and Louis visited them there each year. Defendant was around fifty years old when the trial court heard the matter.

---

[1] We utilize a pseudonym for the child, to protect his privacy.

The parties' relationship began to fray in 2011. Defendant asserts plaintiff began a romance with a co-worker. Subsequent efforts to repair the relationship did not succeed. In 2012, defendant briefly traveled to French Polynesia to visit friends; plaintiff declined to accompany him.

In June 2013, a month after separating, the parties entered into a consent order granting: joint legal custody to the parties; primary residential custody to plaintiff; and parenting time to defendant on Wednesday evenings for three hours and every other weekend. The order also contemplated international travel, stating:

> 1. If father wishes to travel internationally with the minor child for vacation and visitation purposes he agrees to provide the mother with no less than twenty (20) days' notice. Father shall provide to the mother a detailed flight/travel itinerary, a valid destination location and a valid contact number. Child shall be returned to the mother no later than the Friday before school starts unless otherwise agreed upon.

The same day, the trial court set defendant's weekly child support obligation at $218, plus $25 toward arrears, based on defendant's gross weekly income of $1974 and plaintiff's of $1285.

In the wake of the breakup, defendant suffered from depression and anxiety. He received negative warnings about his job performance and sensed he was on the brink of being fired.

3 A-2183-15T2

Defendant also asserted that plaintiff interfered with his exercise of parenting time — although the record does not reflect he made any effort to enforce his rights.

In October 2013, when Louis was six-and-a-half years old, defendant relocated to Bora Bora, French Polynesia. Once there, he decided to make a living as a self-employed photographer, which was his father's profession. His income dropped by roughly seventy-five percent. At the hearing on his child support modification motion, defendant testified he had no desire to work in IT. He explained that pay was low for IT jobs in Bora Bora, and French labor laws prevented him from holding an IT job while running his own photography business.

Defendant remained troubled by the breakup. In emails, texts, and on a website he created using plaintiff's name in the domain name, he both lashed out at plaintiff and expressed his love for her. He posted photographs of her and her boyfriend on the website, along with harsh criticisms of her. Defendant also posted messages on the site addressed to his son.[2] Plaintiff found the

---

[2] For example, one post stated:

> [Louis], I am so sorry I am no longer in your life today as I was over the past 7 years; I always meant well by you and your Mom. I hope perhaps one day your Mom will tell you our story and the choices she made. I tried to

website embarrassing, and alleged defendant used it to harass her. Defendant maintained it was used as a means of communicating with Louis, although the record does not include any evidence that Louis viewed the website.

The record also does not fully reflect the nature of defendant's communications with Louis after he relocated. Defendant contended that plaintiff interfered with his ability to speak to Louis. Plaintiff asserted defendant evaded his responsibilities to support his son financially. Although the record is generally sparse, it does include communications from plaintiff threatening to block defendant's contact with Louis.[3]

Defendant's website was a point of contention between the parties. At one point, he took it down as a conciliatory gesture, but later threatened to reactivate it, after a disagreement with

---

keep our family together but life can take on different turns not always in the ways you wish. I love you very much, I miss you and carry you in my heart everyday. Your Dad

[3] For example, on February 11, 2015, plaintiff wrote:

Over my dead body will you speak to [Louis]. The courts will have to order it and put me in jail before I let you anywhere near him. You are obsessed with the break up still instead of repairing this and moving on with our lives and being the best parents possible to our son. Not until you are remotely close to being there will I allow [Louis] in your life.

A-2183-15T2

plaintiff. In March 2015, plaintiff responded by obtaining a temporary restraining order (TRO) against defendant under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35. She alleged that his threat to restore the website and post more writings and photos, constituted harassment. The TRO barred defendant from contacting Louis or having parenting time. The court entered an extended TRO on March 12, 2015, which no longer prohibited contact with the child, but barred parenting time.

With defendant appearing by telephone, the court conducted a final restraining order (FRO) hearing in July 2015.[4] However, the hearing did not proceed beyond plaintiff's direct examination.[5] In August 2015, the parties entered into a consent order governing the website[6] and defendant's access to Louis, and, in return, plaintiff dismissed the complaint.

---

[4] In June, the court denied defendant's May 2015 appeal from the extended TRO, concluding that an FRO hearing should be held instead.

[5] In the course of reviewing defendant's prior history of domestic violence, plaintiff recounted instances of name calling and also alleged one incident in which defendant kicked her while she was in the shower, causing a bruise. In subsequent motion practice, defendant denied the incident took place.

[6] Defendant was to "remove from any website, computer, or other internet device, any and all covered information relating to [p]laintiff that might currently exist[,]" and was barred from "posting any covered information relating to the [p]laintiff . . . ."

Regarding Louis, the parties acknowledged the importance of fostering a relationship between defendant and his son, notwithstanding their geographical separation:

> 11. **IT IS FURTHER ORDERED** that, since the welfare and best interests of the parties' minor child, [Louis], is an overriding consideration, the parties shall make every reasonable effort to maintain free access and unhampered contact between their child and the other parent and to foster a feeling of affection between [Louis] and the other parent.

The parties agreed not to disparage each other, or attempt to alienate the child from either parent:

> 12. **IT IS FURTHER ORDERED** that neither parent shall do anything which shall estrange the child from the other parent or impair the natural development of the child's love and respect for each of the parents, or disparage the other parent or undermine the parental authority or discipline of the other's household. Neither parent shall use contact with the child as a means of obtaining information about the other parent. The parties shall consult and cooperate with each other in substantial questions relating to religious upbringing, educational programs, significant changes in social environment, and health care of the child.

They also agreed that any communications between them would be by email, and pertain only to Louis.

Defendant was to be afforded parenting time through web and telecommunication technologies such as Skype and Facetime. The

parties adopted a schedule for gradually increasing communications

between father and son:

> 14. **IT IS FURTHER ORDERED** that, given the vast geographical distance between [Louis] and his father, the parties acknowledge and agree that while the father remains abroad, a comparable substitute for in-person weekly contact and communication between Defendant and his son shall include phone and Internet parenting time technologies. . . .
>
> 15. **IT IS FURTHER ORDERED** that Defendant's initial communications with the parties' minor son shall progress in accordance with the following schedule:
>
> a. Week 1: Effective immediately upon the signing of this agreement, defendant shall commence with two weekly communications with the parties' son using any of the methods described in paragraph 14 above.
>
> b. Week 2: Defendant's communications with the parties' son shall increase to three times per week.
>
> c. Weeks 3 and 4: Defendant's communications with the parties' son shall increase to four times per week during the child's summer, school breaks and school holidays but limited to three times per week while the child is attending school.
>
> . . . .
>
> 17. **IT IS FURTHER ORDERED** that the parties' minor child will at all times be free to contact Defendant whenever he wishes without any advance notice to either party.
>
> 18. **IT IS FURTHER ORDERED** that following the conclusion of week four of the above communications schedule, the parties will

collaborate and establish a reasonable and mutually acceptable physical parenting time agreement between Defendant and the parties' minor child.

The parties also addressed international travel:

19. **IT IS FURTHER ORDERED** that if either parent wishes to travel internationally with the minor child for vacation and visitation purposes, the non-traveling parent agrees to sign any and all documents necessary to effectuate the issuance of a passport on behalf of the parties' minor child. The traveling parent shall provide the other parent with no less than twenty (20) days advance notice, a detailed flight/travel itinerary, a valid destination location and a valid contact number.

The order states that "all other orders issued under the FD docket" were to remain in full force and effect.

Six weeks after the parties signed the consent order, defendant's counsel contacted plaintiff[7] to address "outstanding issues" between her and defendant. Noting that the "four weeks of 'electronic' parenting time" had been completed, counsel offered proposals regarding defendant's physical parenting time. He asked that Louis spend Christmas in France with defendant, his two other children, and his parents. Counsel also proposed that Louis spend his 2016 summer vacation with his father. Finally, counsel conveyed defendant's offer to pay plaintiff $500 as

---

[7] Apparently, defendant's counsel was informed that plaintiff was no longer represented by counsel.

settlement of child support arrears. No agreement was reached. According to defense counsel, plaintiff, through her attorney, stated there could be no unsupervised parenting time outside the United States until a period of reunification therapy.

On October 21, 2015, defendant filed his motion to permit Louis to visit defendant in France, and to reduce child support. In his supporting certification, defendant recounted details of the parties' breakup, asserted plaintiff had previously interfered with his ability to speak to Louis, and stated he had completed the four weeks of progressively broadened communications. He also noted plaintiff's objection to his plan for Louis to spend Christmas in France with him and his family, and the summer in Bora Bora with him, and contended that paragraph nineteen authorized his parenting time with Louis in France.

Regarding the child support reduction, defendant asserted he moved to French Polynesia "to try and recover from the upheaval in [his] life." He said, "I only make about 20% of the money that I was earning in the US on average." He asserted the average income in French Polynesia was $18,000; he had paid $16,000 of the

$26,453 in child support owed;[8] but he could not continue contributing this amount, given his current income of $432 a week.

In opposition, plaintiff argued that defendant's request for international parenting time was not in Louis's best interest. She offered her version of the aftermath of the parties' breakup, renewing prior allegations of domestic violence and harassment. She also: denied ever interfering with defendant's ability to speak to Louis; blamed defendant for his separation from his son; and claimed he let days go by without contacting Louis, or sent messages explaining that he could not talk because of work. She asserted defendant "refuses to accept the fact that our son will need a considerable amount of time to adjust to our current circumstances." She contended that reunification therapy would enable defendant to "build a happy and peaceful relationship with our son[.]" She argued that if defendant cared about Louis, "he would not attempt to strip our son away from his mother, and subject him to a foreign environment that he is not accustom[ed] to." She also stated she did not trust defendant would return Louis back to the United States, if he were permitted to travel abroad.

---

[8] According to plaintiff's appendix, as of October 27, 2015, defendant owed plaintiff $12,782.98 in total arrears.

Plaintiff also contended defendant's psychiatric treatment for depression disabled him from caring for his son. She said his "serious psychological issues" needed to be addressed before he could be trusted with exercising unsupervised parenting time anywhere. Plaintiff also opposed defendant's motion to reduce child support, contending defendant has failed to demonstrate "a permanent and substantial change in circumstances."

In a cross-motion, plaintiff sought an order: compelling defendant to participate in reunification therapy with Louis; requiring him to undergo a psychological evaluation; and barring him from both unsupervised parenting time and parenting time abroad. She also asserted that defendant failed to comply with the August consent order pertaining to his website.[9]

In reply, defendant contended he was Louis's primary caretaker when the parties lived together. He noted that in the domestic violence hearing, "[p]laintiff testified . . . that my son has been asking questions that she cannot answer and that he

---

[9] Plaintiff contended that while the website was inactive, if someone typed in the domain name, for a time, one would be redirected to ashleymadison.com. Thereafter, at the motion hearing, plaintiff's counsel complained that a person would be redirected to a photograph of plaintiff and her boyfriend. Notably, plaintiff did not allege defendant had violated the non-disparagement provision of the August consent order.

needs his father."[10]  Defendant asserted that Louis "continually expresses how much he misses me and his desire to visit me in Bora Bora!"  Defendant contended he was deterred from visiting Louis in the United States because of plaintiff's counsel's threat to have him arrested, based on the child support arrears.

Defendant appeared by telephone for the motion hearing on December 17, 2015.  After a brief oral argument on the child support issue, the judge, sua sponte, conducted a direct examination of defendant, who was sworn.[11]  The judge elicited testimony that defendant was not fired; instead, he voluntarily

---

[10] It is unclear whether the transcript of the domestic violence hearing, over which a different judge presided, was presented to the judge hearing defendant's motion and plaintiff's cross-motion.

[11] We express our disapproval of this procedure.  If the court finds there are genuine disputes of material fact on a motion, it may conduct a testimonial hearing.  Isaacson v. Isaacson, 348 N.J. Super. 560, 579 (App. Div.), certif. denied, 174 N.J. 364 (2002). The court should notify counsel that testimony will be heard, so they may prepare and secure the presence of witnesses.  Counsel also should in the first instance determine who to call as witnesses, and to conduct direct and cross-examination. While the court retains the authority to call and question witnesses, N.J.R.E. 614, it should exercise it in an orderly fashion, preserving parties' rights to conduct their own examination of witnesses.  Cf. Franklin v. Sloskey, 385 N.J. Super. 534, 543 (App. Div. 2006).  The court should exercise its authority with restraint to avoid creating the impression that the court is partisan to one side.  State v. O'Brien, 200 N.J. 520, 534-35 (2009); Ridgewood v. Sreel Inv. Corp., 28 N.J. 121, 132 (1958).

quit his job, choosing to relocate to Bora Bora and pursue a living in photography, rather than IT, as he had done for fifteen years.

Regarding parenting time, defense counsel argued that the four weeks of gradually increasing electronic communication constituted reunification and that paragraph nineteen established defendant's right to exercise parenting time internationally, without any therapeutic intervention. Plaintiff's counsel disputed this interpretation of the four-weeks of communications, and contended the parties agreed that additional parenting time would be subject to further discussion and agreement.[12]

Addressing the court on the parenting time issue, defendant stated that Louis expressed his desire to visit him and defendant's parents. "[I]t was actually his interest to go to France to visit my parents. He is the one who brought it up. . . . Then I asked him if eventually he would like to come visit me and that is also his interest to come visit me." Defendant said he had recorded the conversation.

After oral argument, the trial court: denied both of defendant's motions; ordered reunification therapy; denied the

---

[12] Plaintiff's counsel asserted, without any record support, that defendant had not spoken to Louis in six months. Although he conceded he was not an expert, counsel argued that reunification therapy for one or two months would not suffice, rather there "has to be an extended period of time so this kid can get adjusted with his father."

requested psychological examination of defendant; ordered defendant to remove his website; and ordered payment of $20 a week toward arrears. In her oral decision regarding parenting time, the judge highlighted the passage of time since defendant last physically saw Louis and stated it was unclear how he would react to seeing his father. Therefore, she concluded that reunification therapy was needed and that the court would be guided by the recommendations of the therapist as it pertained to future parenting time.

> As far as I'm concerned, the fact that this child does not have physical custody . . . with the father, physical, for two years is of significance to me. It's been a long time since he's seen you. . . .
>
> I'm going to allow you to have contact with your child but it's going to be in the United States initially and no one is saying that this child will never be permitted to go to France. No one is saying that this child will never be permitted to see the grandparents, absolutely not. . . .
>
> I don't know how this child is going to react because I don't know this child. Mother has some concerns, you're saying, no big deal, he'll be fine. I don't know that. . . . So we're going to have reunification therapy.
>
> He hasn't seen you in a long time and it would be nothing for you to be able to travel to the United States, spend a week with the child, liberal contact will occur, in - - you know, <u>we're going to be guided by the therapist</u>. And when the child is ready to travel, I'll let him travel.

I'm not going to put a permanent ban on this child not being able to spend time with you but he hasn't seen you in a very long time and he's a young child, we're not talking about a 15-year-old and what you would like for this Court to do is to allow this child to travel to either Bora Bora or to Europe right now, without seeing you in two years and frankly, that doesn't make sense to me. I think it's putting your wishes ahead of what may be right for the child.

[(Emphasis added).]

The trial court also acknowledged the parties' failure under paragraph eighteen of the consent order to agree to reasonable physical parenting time arrangements and explained that it based its decision on Louis's best interests:

There is no agreement, it was clear that [the parties] should have been in agreement because it says so in the Consent Order that the parties need to come up with a reasonable and mutual, acceptable, physical parenting time agreement. This is where the break down happens. Paragraph 18, you're before me because you can't agree on how that should happen.

My concern is for an eight-year-old child and he will be afforded the most protection. I will not allow the mother to manipulate and I also will not allow [defendant] to manipulate because in the long run this is about [Louis].

Regarding child support, the judge stated:

You have full capabilities of earning far more income than you're earning. I do not care that you live in Bora Bora. What I care about

> is that you meet your financial obligations and I will not accept an argument saying I looked for five jobs and I can't find one, that's not going to fly with me . . . .
>
> [V]oluntarily is the key word here, you weren't laid off, that's a different standard, you left, voluntarily, but that doesn't mean that the child doesn't get the financial support that he deserves.

The trial court's order required defendant to provide plaintiff thirty days' notice before seeking to exercise parenting time in the United States. Defendant was also required to "cooperate with the reunification therapist prior to any parenting time." Plaintiff was ordered to select a therapist covered by her insurance plan.

Soon after entry of the court's order, defendant proposed, with thirty days' notice, to see Louis in New Jersey in January 2016, under the supervision of a therapist, on defendant's way to France. But efforts to identify a therapist were unsuccessful, because of issues of insurance coverage, and therapists' availability or willingness to take on the case.[13]

This appeal followed. Defendant challenges the court's parenting time ruling and the denial of the motion to modify child support. We consider first the parenting time issue.

---

[13] Without objection, the parties included correspondence between counsel pertaining to their failed efforts to identify a therapist.

Notwithstanding our deferential review of Family Part decisions, see Cesare v. Cesare, 154 N.J. 394, 413 (1998), we may reverse if the trial court overlooks governing legal standards, Gotlib v. Gotlib, 399 N.J. Super. 295, 309 (App. Div. 2008), or enters an order that lacks evidential support. See MacKinnon v. MacKinnon, 191 N.J. 240, 253-54 (2007) (stating a reviewing court should uphold a trial court's fact findings if "supported by adequate, substantial and credible evidence on the record" (internal quotation marks and citation omitted)). We apply an expanded scope of review to a trial court's evaluation of underlying facts. Id. at 254. We also owe no special deference to the trial court's legal determinations. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

We review de novo a trial court's interpretation of a contract. Kieffer v. Best Buy, 205 N.J. 213, 222-23 (2011). The courts encourage and honor parties' consensual agreements regarding custody and parenting time, Slawinski v. Nicholas, 448 N.J. Super. 25, 32 (App. Div. 2016), and apply contract principles of interpretation to such agreements. See Quinn v. Quinn, 225 N.J. 34, 45 (2016); Pacifico v. Pacifico, 190 N.J. 258, 266 (2007). However, "the law grants particular leniency to agreements made

in the domestic arena, thus allowing judges greater discretion when interpreting such agreements." Pacifico, supra, 190 N.J. at 266 (internal quotation marks and citation omitted). Although custody agreements are encouraged and enforced, they are subject to modification upon a change in circumstances, in the best interest of the child. See Quinn, supra, 225 N.J. at 46; Abouzahr v. Matera-Abouzahr, 361 N.J. Super. 135, 152 (App. Div.), certif. denied, 178 N.J. 34 (2003).

We recently reviewed the burdens on a party seeking to modify a consensual agreement on custody or parenting time:

> Following the procedural guidance set forth in Lepis, a party seeking modification must present evidence to establish a prima facie case of changed circumstances relating to the visitation. Lepis[ v. Lepis, 83 N.J. 139, 157 (1980)]; R.K. v. F.K., 437 N.J. Super. 58, 61-62 (App. Div. 2014). But not any change in circumstance will suffice; rather, the changed circumstances must be such "as would warrant relief" from the provisions involved. Lepis, supra, 83 N.J. at 157. Upon this initial showing, appropriate discovery shall proceed if warranted. Ibid. Our courts have long emphasized the need for a thorough examination of the merits of the movant's showing. See Sheehan v. Sheehan, 51 N.J. Super. 276 (App. Div.), certif. denied, 28 N.J. 147 (1958). Moreover, the court shall hold a plenary hearing if genuine issues of material fact remain. Lepis, supra, 83 N.J. at 159.
>
> [Slawinski, supra, 448 N.J. Super. at 35.]

See also R.K., supra, 437 N.J. Super. at 62 (noting that Lepis creates a two-step process, and that an applicant must first demonstrate changed circumstances before the court should engage in a best interests analysis); Abouzahr, supra, 361 N.J. Super. at 152 ("party seeking a modification" bears the burden to show change of circumstances).

B.

Applying these principles, we conclude the parties' agreements did not directly entitle defendant to parenting time over Christmas in France, or a summer vacation in Bora Bora, as defendant contends. At the same time, it did not impose preconditions on defendant's ability to exercise physical parenting time with Louis. Requiring reunification therapy as a precondition of physical contact, as plaintiff requested, constituted a significant departure from the parties' agreements. It also burdened defendant's rights to share in the parenting of the child. Cf. N.J.S.A. 9:2-4 (noting that parents have equal rights to custody of child, which shall be determined based on best interest analysis).

In determining whether either parties' motions constituted a modification under Lepis, we first examine the parties' two consent orders. The June 2013 consent order entitled defendant to parenting time every other weekend, Wednesday nights, and "[a]ny

20

additional parenting time [that] may be arranged and agreed upon between the parties." The agreement also contemplated that defendant could travel internationally with Louis. It stated, under the heading "VACATION TIME," that defendant would provide twenty days' notice "[i]f father wishes to travel internationally with the minor child for vacation and visitation purposes[,]" and to return the child the Friday before school starts. However, the agreement did not identify when such vacation or parenting time would occur.

Similarly, the August 2015 consent order, entered after defendant had been in Bora Bora for almost two years, did not expressly entitle defendant to parenting time in France or Bora Bora. Rather, it reflected the parties' lack of agreement regarding physical parenting time between defendant and Louis. It stated that, upon completion of the four weeks of increasing telecommunication, "the parties will collaborate and establish a reasonable and mutually acceptable physical parenting time agreement between Defendant and the parties' minor child." Therefore, neither the 2013 nor the 2015 order explicitly granted defendant an absolute right to travel with Louis internationally, without plaintiff's approval. As such, defendant's motion seeking court orders requiring Louis to spend Christmas and the summer

with defendant constituted a modification of the parties' consent orders.

However, their agreements also did not impose conditions upon defendant's physical contact with the child. The 2015 order expressly preserved the prior FD orders, which included the 2013 order to the extent not inconsistent. Thus, nothing in the two orders authorized imposing therapy as a precondition of defendant's exercise of parenting time. Consequently, plaintiff's request regarding therapy constituted a modification of the party's agreements as well.

Next, defendant's relocation to French Polynesia, as well as his physical absence from his son for almost two years, constituted a significant change in circumstances since the 2013 consent order, such "as would warrant relief" from the provisions regarding physical parenting time and international travel. See Lepis, supra, 83 N.J. at 157. Thus, defendant bore the burden of demonstrating that it was in Louis's best interest to travel to France and spend time with his father and paternal grandparents, as he had in years past. As we discuss later in this opinion, we conclude that the record supports a finding that it remained in Louis's best interests to travel to France and be with his father.

Nevertheless, defendant's geographical relocation alone did not constitute a change relevant to his capacity to parent or the

22

best interests of the child with respect to parenting time, regardless of location. Thus, we are not satisfied that plaintiff met the significantly weightier burden of demonstrating the necessity of imposing reunification therapy as a precondition to any parenting time. See Slawinski, supra, 448 N.J. Super. at 33-34.

C.

The court's order compelling reunification therapy in New Jersey as a precondition to any other parenting time suffers from two flaws. First, the order fails to define the goals of the therapy. Second, the order lacks sufficient evidential support in the record.

We begin with the simple question, what is "reunification therapy"? The term is not so clearly defined in our case law that an order that does no more than prescribe it meets the basic requirement of enforceability. Cf. State v. Sommers Rendering Co., 66 N.J. Super. 334, 342 (App. Div. 1961) (stating that a court's injunction "should be reasonably specific, so that the person enjoined may readily know what he must do or refrain from doing."); see also 42 Am. Jur. 2d Injunctions § 260 (2010) (stating that "[b]asic fairness" requires that "the terms of an injunction should have sufficient clarity and specificity to allow the parties to ascertain with reasonable certainty what is prohibited or

required").  Indeed, the trial court itself was unsure what the reunification therapy would involve in this case and, instead, noted the extent and scope of the therapist's involvement would depend on the therapist's own judgment:

> THE COURT:  I'm not going to tell a therapist how to do their job because there's a protocol.
>
> . . . .
>
> THE COURT:  There are guidelines, they're licensed.  There are -- I can't say you're not allowed to talk to the mother.  Maybe the first visit should -- maybe they'll get the first visit will be with mom for 15 minutes and then they can call dad for 15 minutes.
>
> . . . .
>
> THE COURT:  I don't know.  But what I do know is the point of it is to have the father re-integrated into this child's life.  It would make no sense to me that is the point of the therapy, is to reunify, get dad back into this child's life where he can see the father, he can see the father in New York, he can see the father in Pennsylvania, he can see the father in New Jersey, I don't care but he's going to see the father in the United States.  Okay.
>
> And most likely, the father will be asked to physically be present with the therapist the first time he comes in and maybe the therapist will say take him out for lunch and this and that for a few hours, bring him back to mom's house and then come back.  How long are you going to stay?  I don't know, but that's why we have someone with a license that does know how to do this.  And perhaps your client will be asked to come back again in

24

three months or what not to the point where if this child is comfortable, there are no concerns, then mom's going to allow him to take a plane and go visit the grandparents with the dad, absolutely.

Although our case law does not supply a definition, it appears that reunification therapy is designed to treat a psychological condition or dysfunctional family relationship, such as those which arise from parental alienation or abuse.[14]  One author has described it as follows:

---

[14] We also note that the Adoption and Safe Families Act of 1997, 42 U.S.C. § 629a(a)(7), defines "reunification services" in the context of children removed from their homes and placed in a foster home or child care institution.  Under the umbrella of family reunification services, the Act identifies several distinct services and activities:

> (i) Individual, group, and family counseling.
>
> (ii) Inpatient, residential, or outpatient substance abuse treatment services.
>
> (iii) Mental health services.
>
> (iv) Assistance to address domestic violence.
>
> (v) Services designed to provide temporary child care and therapeutic services for families, including crisis nurseries.
>
> (vi) Peer-to-peer mentoring and support groups for parents and primary caregivers.
>
> (vii) Services and activities designed to facilitate access to and visitation of children by parents and siblings.

> Reunification therapy occurs between the therapist and the family. The focus is threefold: tempering the hostilities of the alienating parent; assuring an emotional and safe environment for the children with both parents and significant others; and repairing the damaged relationships with the children. The term "reunification therapy" is becoming more common, although there are few detailed treatment protocols for this form of treatment.
>
> [Douglas Darnall, <u>The Psychosocial Treatment of Parental Alienation</u>, 20 <u>Child Adolescent Psychiatric Clinics N. Am.</u> 479, 483 (2011).]

Other authors have described reunification therapy as "an intervention aimed at supporting a renewed relationship, usually between a parent or caretaker and a child.  The intervention is typically designed for cases of polarization or estrangement . . . ."  Lynne Kenney Markan and David K. Weinstock, <u>Expanding Forensically Informed Evaluations and Therapeutic Interventions in Family Court</u>, 43 <u>Fam. Ct. Rev.</u> 466, 471 (July 2005).  This therapy "generally consists of progressive interaction between a child and parent or sibling that begins in the office of a behavioral health professional and proceeds with step-wise

---

> (viii) Transportation to or from any of the services and activities described in this subparagraph.
>
> [42 <u>U.S.C.</u> § 629a(a)(7)(B).]

approximations to the custody/parenting-time order at a rate that supports the well-being of the child."[15]  Id. at 471-72.

Applying these definitions, we discern insufficient support in the record for the court's order of reunification therapy.  The sole predicate of the court's order was its finding that defendant and Louis had not had physical contact in over two years.  While the separation of father and son is certainly significant, there was no evidence or finding that Louis resisted seeing his father, was angry at his father, or that he would suffer emotional or psychological harm in spending time with him.  Nor does the record support a finding that Louis or defendant suffered from any emotional or psychological condition that warranted reunification therapy before parenting time.[16]

Plaintiff was required to establish the factual basis for imposing this hurdle before allowing defendant to exercise physical contact with Louis.  However, neither party clearly set

---

[15]  The authors stated that reunification therapy is also "useful in a broad array of family law circumstances," but did not define them.  Id. at 471.  Unlike the Darnall article, the authors do not cite any learned authority or research in support of their opinions.

[16]  We reject plaintiff's argument that defendant's treated depression, by itself, disabled him from exercising parenting time.  In any event, the court did not rely upon defendant's condition in ordering reunification therapy, nor was there any indication that reunification therapy was designed to address issues related to that condition.

A-2183-15T2

forth in any detail the nature of defendant's relationship with Louis, particularly after defendant relocated. Defendant maintained he was the child's primary caregiver, but plaintiff asserted the parties shared parenting duties. Defendant also asserted plaintiff interfered with his communication with Louis after he relocated. She denied that, but the record includes her threats to block his communication.

The record provides little evidence regarding how Louis reacted to his father's departure. Furthermore, even if Louis himself needed therapy to help cope with these new circumstances, that does not necessarily trigger the need for "reunification therapy" to repair or restore a damaged relationship with his father.

In any event, plaintiff presented no evidence to rebut defendant's assertion that his son wanted to see him and his parents. While the preferences of a boy just a month short of his ninth birthday should not be dispositive, his eagerness to see his father should not have been dismissed out of hand. See Lavene v. Lavene, 148 N.J. Super. 267, 272 (App. Div.), certif. denied, 75 N.J. 28 (1977); N.J.S.A. 9:2-4. Just as fear or resistance would have tended to support plaintiff's position, the child's eagerness to see his father was relevant and undermined plaintiff's assertion that therapeutic intervention was needed. Had the court harbored

doubts about the child's attitude toward visiting his father and family, or wished to explore the child's perspectives, the court could have interviewed the child. R. 5:8-6. Alternatively, the court could have ordered an independent examination of the child. Instead, the court presumed, in the absence of evidence, that the child's best interests lay in interposing a barrier to his physical contact with his father. In that, the court erred.

However, based on the record before us, defendant met his burden to establish that it was in Louis's best interests to travel to France to visit his father over the Christmas holiday. As noted, Louis wanted to see his father and his father's parents. The trip would allow Louis to strengthen his relationship with his father, and preserve his ties to his father's family. There was also no evidence that the trip would be harmful.[17] Louis would be traveling to a familiar place, to visit his father and family members. Moreover, a trip to France could be scheduled to avoid

---

[17] There is no evidence that defendant disparaged the mother to the child, except through the website, which the child may never have viewed and was later taken down. We are not satisfied that defendant's past provocative comments on the website provide grounds to prohibit him from spending time with his son, particularly in light of his apparent compliance with the August 2015 non-disparagement provision. The court may certainly continue to restrain defendant from disparaging plaintiff during parenting time and communications with his son.

interference with schooling and the details of the actual travel could be ironed out in a way that accommodated Louis's needs.[18]

### III.

Defendant's appeal of the court's order denying a reduction in child support lacks merit. We note at the outset that defendant failed to include with his motion a current and past case information statement that would have set forth a complete picture of his financial situation and how it changed. See R. 5:5-4(a). That alone provides a basis for denying defendant's motion.

In any event, defendant has failed to meet his burden to show "such 'changed circumstances' as would warrant relief from the support or maintenance provisions involved." Lepis, supra, 83 N.J. at 157. "When the movant is seeking a modification of child support, the guiding principle is the best interests of the children." Dolce v. Dolce, 383 N.J. Super. 11, 19 (App. Div. 2006) (internal quotation marks and citation omitted). "[W]hen a parent, without just cause, is voluntarily unemployed or underemployed, income may be imputed to that parent to provide for the child's needs." Caplan v. Caplan, 182 N.J. 250, 268 (2005).

---

[18] Defendant had proposed that Louis travel with his step-siblings. But, even if he did not, airlines are experienced in accommodating unaccompanied minors.

There is no question that defendant is underemployed. He chose to switch professions, leaving IT for photography. He also chose to relocate to an area with fewer and less remunerative opportunities than were available in New Jersey. The dispositive question is whether defendant did so with "just cause." See ibid. That was his burden to establish.

There certainly are circumstances that would justify a parent voluntarily reducing earnings, for example, where the job poses a health risk to the parent or interferes with his ability to parent. Cf. Lissner v. Marburger, 394 N.J. Super. 393, 404 (Ch. Div. 2007). When an obligor has sought to reduce a spousal or child support obligation because of an early retirement, the court has decided "whether the advantage to the retiring [obligor] substantially outweighs the disadvantage to the payee . . . ." Deegan v. Deegan, 254 N.J. Super. 350, 357-58 (App. Div. 1992) (reduction of alimony); see also Lissner, supra, 394 N.J. Super. at 404-05 (reduction of child support).[19] The same essential balancing should govern a reduction based on a voluntary career change.

In weighing the advantages and disadvantages, the court should consider at least three factors:

---

[19] We recognize that the Legislature recently codified standards for modifying alimony due to early retirement. N.J.S.A. 2A:34-23(j)(2); L. 2014, c. 42, § 1.

> (1) the benefits to the . . . parent, based on his or her age, health, timing, finances, assets, reasons for [career change] . . . ; (2) the impact on the child of reduced support, based on his or her needs, age, health, assets, and standard of living to which he or she has grown accustomed, and any proffered advantages to the child from the parent's [career change]; [and] (3) the fairness of the decision, based on the obligor's motivation, good faith, and voluntariness of the [career change] . . . .
>
> [Lissner, supra, 394 N.J. Super. at 405.]

The court should also be guided by the statutory factors governing child support. Id. at 401-02.[20]

---

[20] N.J.S.A. 2A:34-23(a) lists the following factors:

> (1) Needs of the child;
>
> (2) Standard of living and economic circumstances of each parent;
>
> (3) All sources of income and assets of each parent;
>
> (4) Earning ability of each parent, including educational background, training, employment skills, work experience, custodial responsibility for children including the cost of providing child care and the length of time and cost of each parent to obtain training or experience for appropriate employment;
>
> (5) Need and capacity of the child for education, including higher education;
>
> (6) Age and health of the child and each parent;

A-2183-15T2

Defendant contended that he needed a change, because of the impact of his break-up with plaintiff. He said his job performance suffered and he was on the brink of termination. Assuming all that was true, defendant still failed to establish that he was compelled to move to Bora Bora, to abandon the IT profession altogether, and to accept a seventy-five percent reduction in income. Nor did he establish that the benefits to him outweighed the disadvantages to his son.

Finally, Ibrahim v. Aziz, 402 N.J. Super. 205, 212 (App. Div. 2008), upon which defendant relies, does not compel a different result. In Ibrahim, we reversed a child support order predicated on imputed New Jersey earnings, where the defendant was an Egyptian citizen who did not earn any income while in the United States on a visitor's visa. Id. at 209-12. The defendant was "not voluntarily underemployed by virtue of leaving this State and returning to Egypt." Id. at 212. By contrast, although defendant

---

(7)  Income, assets and earning ability of the child;

(8)  Responsibility of the parents for the court-ordered support of others;

(9)  Reasonable debts and liabilities of each child and parent; and

(10) Any other factors the court may deem relevant.

was a French citizen, he had lived and worked in the United States since he was twenty-five and became a dual citizen of the United States while this case was pending.

IV.

We recognize that fifteen months have passed since the court entered the order on appeal. We are unaware of whether defendant has exercised any physical parenting time during this period. The relationship between defendant and his son, and the son's attachment and attitude toward his father may have deteriorated. Alternatively, despite their physical separation, the relationship may have strengthened through regular contacts by telecommunications and other means.

Nonetheless, based on the record before us, plaintiff failed to meet her burden to establish the need for reunification therapy, and defendant established that it was in Louis's best interests to establish a schedule for physical parenting time with his father. Absent a persuasive showing of a change in circumstances since entry of the order on appeal, the court should devise a schedule for the father's physical parenting time.

Affirmed in part; reversed in part, and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2183-15T2